UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert John UMAGAT, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellant,

v.

Cassandra Pangelinan BELANGER,
Defendant–Appellee.

UNITED STATES of America,
Plaintiff–Appellant,

v.

Diana M. ROBERTO, Defendant–
Appellee.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Cassandra Pangelinan BELANGER,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Diana M. ROBERTO, Defendant–
Appellant.

Nos. 92–10149, 92–10173, 92–10174,
92–10190, 92–10207.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 4, 1992.

Decided July 30, 1993.

Howard Trapp, Agana, Guam, for defendant-appellant Robert John Umagat.

Jerry E. Hogan, Agana, Guam, for defendant-appellee-cross-appellant Cassandra Pangelinan Belanger.

Kevin J. Fowler, McCully, Lannen, Beggs & Melancon, Agana, Guam, for defendant-appellee-cross-appellant Diana M. Roberto.

Karon V. Johnson, Asst. U.S. Atty., Agana, Guam, for plaintiff-appellant-cross-appellee U.S.

Before: BROWNING, NORRIS, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

Robert John Umagat, Cassandra Pangelinan Belanger, and Diana M. Roberto appeal on sufficiency grounds their convictions for conspiracy to smuggle marijuana. The United States appeals the sentences imposed on Belanger and Roberto. We reverse the convictions of Belanger and Roberto, and affirm those of Umagat.[1]

## BACKGROUND

Around August of 1989, Danilo Grantham ("Danny"), who had previously smuggled marijuana from the Philippines into Guam on

---

1. Because we reverse the convictions of Belanger and Roberto, we do not reach the government's appeal of their sentences.

at least three occasions, began making arrangements to import to Guam approximately three hundred pounds of marijuana, hidden inside several pieces of furniture. He asked Christopher Grantham ("Chris"), his half-brother and co-conspirator, who had assisted him with two previous transactions, to help in locating a compliant officer in the Customs Service. Chris in turn sought the assistance of Michael Aguon, the manager of the nightclub where he was employed. Aguon had not participated in any previous transactions but had agreed to participate in the planned importation. He introduced Chris to appellant Robert Umagat, a boyhood friend, who was at that time the only narcotics dog handler on Guam. For reasons unrelated to the Granthams' activities, Umagat had previously trained his dog not to alert to the odor of marijuana. However, he had had no prior contact with the Granthams or the ongoing conspiracy. After two meetings, including one with Danny, Umagat agreed to let the marijuana pass through Customs undetected. He was promised a quarter share of the proceeds, which he expected would amount to approximately $20,000.

Danny and Chris travelled to the Philippines to arrange the shipment of drugs to Guam, and returned separately. On Danny's return, Customs officials seized certain of his papers pertaining to the shipment. Concerned, Danny, Chris, and Aguon met with Umagat, who assured them that he could still pass the load through Customs undetected. Customs officials, however, alerted by the seized documents, placed the shipment under surveillance when it arrived. Umagat warned Aguon that the drugs had been discovered and suggested that the venture be abandoned. The Granthams and Aguon ignored Umagat's advice. Without his participation, they formulated a plan to recover the marijuana despite the surveillance. Aguon contacted appellant Diana Roberto, an employee of Dollar Rent-a-Car, and appellant Cassandra Belanger, Roberto's supervisor at

Dollar Rent-a-Car. He told them that a friend of his had "some marijuana" arriving soon and that he needed an untraceable car. Belanger and Roberto agreed to furnish him with a car from Dollar in exchange for a small share of the marijuana or other compensation. The plan to retrieve the marijuana failed and the appellants were arrested.

The indictment under which the appellants and their co-defendants were charged alleged a conspiracy to import marijuana, and a conspiracy to distribute it, that encompassed all four shipments of marijuana, not simply the last, unsuccessful transaction. In all, it alleged that at least fifteen people were involved in the two overall conspiracies. Umagat was found guilty of both conspiracies, and was sentenced to eighty-eight months in custody. Belanger and Roberto, who were not charged with the conspiracy to import, were found guilty of the conspiracy to distribute, and were sentenced to two months of home detention and three years of probation.[2]

## DISCUSSION

The appellants do not dispute the existence of an overall conspiracy to import marijuana, encompassing all four shipments, and an overall conspiracy to distribute that contraband. They contend, rather, that insufficient evidence exists to prove beyond a reasonable doubt the necessary slight connection between themselves and the conspiracies. *United States v. Sanchez–Mata,* 925 F.2d 1166, 1167 (9th Cir.1991).

"'One may join a conspiracy already formed and in existence, and be bound by all that has gone before in the conspiracy, even if unknown to him.'" *United States v. Bibbero,* 749 F.2d 581, 588 (9th Cir.1984), *cert. denied,* 471 U.S. 1103, 105 S.Ct. 2330, 85 L.Ed.2d 847 (1985) (quoting *United States v. Knight,* 416 F.2d 1181, 1184 (9th Cir.1969)). However, a defendant cannot be legally bound to a conspiracy unless his understanding with co-conspirators "was of sufficient

2. Belanger and Roberto were charged with possession of marijuana with intent to distribute, as well as with the conspiracy to distribute. Umagat was charged with importation of marijuana and possession of marijuana with intent to distribute as well as with the two conspiracies. None of the appellants was convicted on any of the other counts, and none of those counts is at issue here.

scope to warrant the conclusion that he embraced the common purpose of the conspiracy." *Id.* at 587. Indicative of a defendant's understanding are the degree of his knowledge, actual or constructive, of the scope of the *overall* conspiracy, and the extent to which his own benefits depended on the success of the *entire* venture. *Id.* at 588; *United States v. Brown*, 912 F.2d 1040, 1043 (9th Cir.1990). We now consider the appellants' actions in light of this test.[3]

### A. Belanger and Roberto

■ The unlawful acts of Belanger and Roberto consisted of procuring an untraceable car for Aguon on a single occasion, in connection with the final shipment of marijuana. Yet Belanger and Roberto were charged with, and convicted of, the entire conspiracy to distribute marijuana—a conspiracy that encompassed the three prior distributions as well as the final, failed attempt. Neither the evidence adduced at trial nor the scope of their own actions suggests either that they possessed actual knowledge of the breadth of the overall conspiracy, or that we may attribute such knowledge to them.

The evidence presented at trial showed that Belanger and Roberto knew that Aguon and "a friend" of his would soon be smuggling marijuana to Guam. Their connection to the scheme was through Aguon, who had not himself been involved in prior transactions conducted by the enterprise. They furnished Aguon with a car with which he was to pick up the marijuana. Nothing indicates that either Belanger or Roberto expected her involvement in the enterprise to be ongoing. Furthermore, no evidence presented at trial suggests that their receipt of the ounce or so of marijuana, or the other compensation they expected to realize from the transaction, de-

pended on the success of the entire overall smuggling operation, which encompassed all four transactions.

We find *United States v. Brown, supra,* controlling. There, several borrowers concealed from a bank the fact that they were alter egos for a man to whom the bank had already loaned the maximum permissible under federal regulations. 912 F.2d at 1041. Brown participated in one loan transaction on behalf of the true borrower. Nothing showed that he knew of other such transactions, or that he knew that there was an overall plan at all. We reversed his conviction for the overall conspiracy to defraud, stating, "Given one conspiracy [rather than multiple conspiracies], it is not possible to justify a decision that Brown knew of or depended upon [the overall conspiracy], even though its success depended upon him in part. He could hardly be held to have agreed to that of which he knew naught." *Id.* at 1044. Our reasoning in *Brown* applies with equal force here. Belanger and Roberto cannot be held criminally responsible for an overall conspiracy to distribute marijuana of which they were ignorant and upon which their own benefits did not depend.

Nor may we infer the awareness of Belanger and Roberto of the entire operation from the level of their participation in the final transaction. It is true that in *Bibbero, supra,* we imputed knowledge to a defendant of an entire, overall marijuana-smuggling conspiracy, even though the defendant joined the ongoing enterprise after its inception, and participated only in the last few transactions. The differences between *Bibbero* and this case, however, are striking. *Bibbero* was involved in more than one shipment of marijuana, making it less likely that he had no actual knowledge of the overall operation. More important, *Bibbero* did not simply par-

---

3. Where an indictment alleges an overall conspiracy which the defendant joined after its inception, we are faced with two inquiries. The first is whether the overall conspiracy existed. To answer this question, we employ a factors analysis, considering the nature of the scheme; the identity of the participants; the quality, frequency and duration of each conspirator's transactions; and the commonality of time and goals. *See, e.g., Brown*, 912 F.2d at 1043; *Bibbero*, 749 F.2d at 587; *United States v. Arbelaez*, 719 F.2d

1453, 1458 (9th Cir.1983), *cert. denied*, 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984); *United States v. Zemek*, 634 F.2d 1159, 1168 (9th Cir.1980), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981). Here, the appellants conceded the existence of the two overall conspiracies charged in the indictment. The second inquiry is whether the defendant was connected to the overall conspiracy. To answer that question, we consider the scope of his agreement with his co-conspirators.

ticipate in the marijuana-smuggling enterprise. Once he joined the operation, he became its prime mover. Virtually every act performed in furtherance of the transactions in which he was involved was performed by him, at his direction, or under his supervision. He travelled to Thailand to buy the drugs, putting up half the cost of their purchase. He readied the loads for shipment to the United States. When the boat carrying the marijuana developed engine trouble near Japan, he advanced $25,000 to repair it. He ensured that one of his friends was hired to help off-load the drugs so that he could more closely supervise the off-loading. He oversaw an off-loading operation. After a successful importation, he attended a victory party. 749 F.2d at 582–83. We have described Bibbero as someone who "bec[a]me immersed in the overall enterprise, even though he may not have participated in earlier transactions." *Brown*, 912 F.2d at 1044. Bibbero's complete absorption in the overall operation allowed us to infer his knowledge of prior shipments and the dependence of his own benefits on the success of the whole venture. 749 F.2d at 588.

By contrast, Belanger and Roberto performed only a minor role in the single transaction in which they participated. Unlike Bibbero, they were not the *central* figures in the *overall* smuggling operation. Rather, they were among the *least significant* participants in a *single transaction*. The conduct engaged in by Belanger and Roberto simply does not permit us to impute to them the knowledge of the overall conspiracy alleged in the indictment.

Nor was the overall conspiracy of which they were convicted of the type in which "each person can be deemed to know that he is part of an overall distribution network, each portion of which must work if anyone is to benefit." *Brown*, 912 F.2d at 1044. While Belanger and Roberto constructively knew that each actor *in the single transaction in which they were involved* had to perform adequately if anyone was to benefit, they did not know—and cannot be deemed to have known—that other such transactions had occurred. The success of the overall conspiracy, like the success of the conspiracy in

*Brown*, depended in part on the acts they performed in furtherance of the single transaction in which they were involved. However, a jury could not say beyond a reasonable doubt, any more than it could in *Brown*, that Belanger and Roberto's acts in furtherance of that single transaction demonstrate that they knew of, or depended upon, the overall conspiracy.

In sum, nothing establishes, or permits us to infer, that Belanger and Roberto knew that there was an overall plan, encompassing a series of distributions of marijuana. We cannot say that the agreement Belanger and Roberto had with Aguon was of sufficient scope to allow us to conclude that the two women embraced the common purpose of the entire, overall conspiracy to distribute marijuana. Their convictions must therefore be reversed.

### B. Umagat

As noted above, Umagat was convicted of an overall conspiracy to import as well as an overall conspiracy to distribute. There can be no doubt that Umagat knew the scope of the *single transaction* in which he was involved, knew that the transaction included both importation and distribution, and knew that his own benefits—some $20,000—depended on the success of all aspects of that transaction. As the gatekeeper who guaranteed safe passage of the last shipment of marijuana into Guam, Umagat assumed significant responsibility for the success of what turned out to be the conspirators' final operation.

Umagat's awareness of and participation in one transaction does not in itself connect him to the entire, months-long conspiracy, which encompassed four such transactions. However, the circumstances surrounding his affiliation with the conspirators, the sophistication of the conspirators' arrangements, and the crucial importance of Umagat's role to the final transaction all combine to support the existence of that connection, and to allow a jury to so conclude beyond a reasonable doubt.

As the only narcotics dog handler on Guam, Umagat was prominent in the public relations efforts of the Customs Service,

making frequent appearances with his dog at schools and other public places. He had a great deal to lose by not inquiring into the workings of the Granthams' enterprise before agreeing to become a participant. If he were exposed as a member of the conspiracy, he stood to lose his job, to suffer the intense and public opprobrium society reserves for law-enforcers who become law-breakers, and to be subjected to additional extensive and unpleasant publicity because of his frequent and conspicuous endorsement of the ideals of law enforcement. These facts strongly suggest that Umagat did not join the Granthams and Aguon without having obtained some knowledge regarding their past success at smuggling marijuana into Guam.

Moreover, Umagat was a Customs officer as well as a narcotics agent. His position made him aware of the wide-spread attempts and varied methods of smuggling contraband into Guam. Nor was his experience with smuggling confined to such observations. It is clear that Umagat was willing and able to participate in frequent and elaborate drug transactions. He engaged in the highly unusual course of training his dog not to alert when it detected marijuana, and he boasted that he had previously engaged in a transaction similar to that planned by the conspirators in concert with another drug smuggler. He possessed extensive knowledge of smugglers' methods, and, through patient and careful preparation, had gained the experience to put his knowledge into practice. Together with his prominent position, these circumstances suggest that Umagat affiliated himself with the Granthams only after becoming aware of the entire scope of their smuggling activities.

In addition, Umagat was familiar with and helped to polish the conspirators' detailed plans, which included elaborate arrangements to buy the drugs, conceal them in furniture, transport them to Guam, and smuggle them through Customs. The intricacy of these plans, and the forethought and careful attention to detail that they reveal, put Umagat on notice that his partners in the final transaction were experienced smugglers.

Finally, Umagat, unlike Belanger and Roberto, became a leading actor in the effort to import and distribute marijuana. He eagerly accepted the crucial role of enabling the marijuana to pass through Customs safely, and assured the Granthams and Aguon that the safe passage of the drugs was "guaranteed." He met with the other conspirators on four occasions to plan the drugs' acquisition, concealment in furniture, and passage through Customs, and he exacted a heavy price for his central role.

Umagat's experience and knowledge, the sophistication of the arrangements, and his own critical role "at the core of the conspiracy," *United States v. Bibbero*, 749 F.2d at 588, combined to provide him with the constructive (if not the actual) knowledge that the conspirators were seasoned and that the transaction in which he was involved was not an isolated one. The jury was permitted to impute to Umagat the knowledge that the conspiracy extended beyond the single shipment in which he was directly involved. The facts collectively permit the inference that Umagat's agreement with his co-conspirators encompassed the scope of the entire conspiracy to import and the entire conspiracy to distribute. We therefore affirm his convictions.

**AFFIRMED IN PART, REVERSED IN PART.**