UNITED STATES of America,
Plaintiff–Appellee,

v.

Basilio CASTANEDA, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Rolando QUINONEZ, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Luis Navarro CASILLAS,
Defendant–Appellant.

Nos. 92–10722, 92–10728 and 92–10734.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1993.

Decided Feb. 17, 1994.

William M. Goodman, Topel & Goodman, George J. Cotsirilos, Jr., Cotsirilos & Campisano, San Francisco, California, Arturo Hernandez, San Jose, California, for the defendants-appellants.

Samuel Wong, Assistant United States Attorney, Sacramento, California, for the plaintiff-appellee.

Before: CANBY and NOONAN, Circuit Judges, and ORRICK,* District Judge.

CANBY, Circuit Judge:

Basilio Castaneda, Rolando Quinonez, and Luis Casillas appeal their sentences and convictions of conspiracy to engage in money laundering and of several substantive counts of money laundering. We affirm Casillas's convictions and sentence. As to Quinonez and Castaneda, we affirm in part, reverse in part, and remand for resentencing.

I

In 1991, federal agents began an investigation of money laundering and cocaine trafficking in the Modesto, California area. To

---

* The Honorable William H. Orrick, Jr., Senior United States District Judge for the Northern District of California, sitting by designation.

aid in the investigation, the agents recruited a former drug dealer, Ignacio Felix, to carry out an undercover sting operation. They set up Felix in an apartment that was outfitted with covert video and audio recording equipment, a money counting machine, a duffle bag containing bottles of lidocaine, a triple beam balance, and cash to represent the proceeds of cocaine dealing.

On June 18, 1991, Felix made his first contact with appellant Quinonez, telephoning him on instructions from the agents. At a meeting the following day at Quinonez's real estate office, Felix explained that he had a large amount of cash he had earned in the cellular phone and beeper business. He told Quinonez that he wanted to invest this cash in real estate, but did not want to fill out any government forms. Quinonez responded by suggesting several ways to avoid reporting requirements: (1) going from bank to bank and purchasing cashier's checks for amounts less than $10,000, (2) opening accounts at several different banks and slowly depositing the money, and (3) giving the money to someone with several bank accounts who would in turn give checks to Felix.

Over the next few weeks, Felix and Quinonez had several more conversations during which Felix hinted, but never specifically stated, that the funds he needed laundered were proceeds from cocaine trafficking. At some point, Quinonez suggested that his brother, appellant Castaneda, could help in the laundering scheme. Thus, on August 19, 1991, Quinonez took Castaneda to Felix's apartment to make arrangements to have Castaneda launder money for Felix. Felix and Castaneda agreed that Castaneda would take $20,000 in cash to convert into cashier's checks which he was to return the following day. However, when Felix mentioned that he then would have an additional $50,000 for Castaneda to launder, Castaneda expressed some reluctance, saying that that was too much, and that he would prefer to do it little by little. Quinonez assured Felix that if Castaneda would not launder the additional money fast enough, he would get another person who would do it. At the end of the meeting, Castaneda left with $20,000 to launder in return for an eight percent commission.

The following day, Castaneda returned to Felix's apartment with $25,000 in cashier's checks of various amounts. Felix gave Castaneda his commission plus money to cover the extra $5,000 in checks Castaneda had delivered. Following this delivery, Castaneda received and laundered an additional $25,000, making his last delivery of cashier's checks to Felix on August 30, 1991. There is no evidence that Quinonez and Castaneda had any dealings with Felix after August 30.

On September 3, Felix contacted appellant Casillas, who worked in the same real estate office as Quinonez, and told him he wanted to invest in property. They did not speak again until September 13, when Felix and Casillas had a recorded telephone conversation during which they discussed how Casillas could help launder money for Felix. Casillas recruited Leopoldo Gutierrez and Francisco Cordova, and over the next two months the three laundered several thousand dollars for Felix. Neither Quinonez nor Castaneda was directly involved in these transactions, the last of which occurred on November 15, 1991.

On December 6, 1991, Quinonez, Castaneda, Casillas, Cordova, and Gutierrez were indicted on the following charges:

Count 1 (all defendants): Conspiracy to engage in money laundering and structured financial transactions between on or about June 1991 through on or about November 15, 1991, in violation of 18 U.S.C. § 371, 18 U.S.C. § 1956(a)(1)(B), and 31 U.S.C. § 5324.

Counts 2–5 (Quinonez and Castaneda): Money laundering and aiding and abetting on or about August 20, 1991, and between on or about August 22, 1991 through on or about August 30, 1991, in violation of 18 U.S.C. § 1956(a)(3)(B) and 18 U.S.C. § 2.

Counts 6–12 (Casillas and Cordova) Engaging in structured financial transactions and aiding and abetting between on or about November 13, 1991, and November 15, 1991, in violation of 31 U.S.C. §§ 5324(3), 5322(a), 5313(a), and 18 U.S.C. § 2.

Cordova and Gutierrez pled guilty to lesser charges prior to trial. The remaining defendants were convicted by a jury of all charges, and now appeal.

Underlying nearly all of their claims on appeal is appellants' view that the facts reveal—and the government proved—not the single large conspiracy charged in Count 1 of the indictment, but at most two smaller conspiracies: one between Quinonez and Castaneda (the "Quinonez conspiracy") running from June 19, 1991 to August 30, 1991, and a second between Casillas, Cordova, and Gutierrez (the "Casillas conspiracy") running from September 3, 1991 to November 15, 1991.

## II

■ All three appellants object that the district court improperly admitted hearsay testimony under the so-called coconspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E). This rule provides that a statement is not hearsay if it is made by a coconspirator of a party, and was made in the course and furtherance of the conspiracy. Under this rule, an accused's knowledge of and participation in an alleged conspiracy with the putative coconspirator are preliminary facts that must be established, by a preponderance of the evidence, before the coconspirator's out-of-court statements can be introduced into evidence. *United States v. Silverman*, 861 F.2d 571, 576 (9th Cir. 1988). In order to establish these facts, the government cannot rely solely on the coconspirator statements themselves. *Id.* at 578. It must produce some independent evidence which, viewed in light of the coconspirator statements, establishes the requisite connection between the accused and the conspiracy. *Id.* While the government need show only a slight connection with the conspiracy, *United States v. Umagat*, 998 F.2d 770, 772 (9th Cir.1993), the independent evidence must be "fairly incriminating:"

> Evidence of wholly innocuous conduct or statements by the defendant will rarely be sufficiently corroborative ... to constitute proof, by a preponderance of the evidence,

that the defendant knew of and participated in the conspiracy.

*Silverman,* 861 F.2d at 578.

At issue here is the existence of this independent evidence. Appellants contend that there is insufficient independent evidence of a connection between the Casillas conspiracy and the Quinonez conspiracy to permit admission of Casillas's statements against Quinonez and Castaneda, and conversely to permit admission of Quinonez's and Castaneda's statements against Casillas.

### A. Standard of Review.

■ The standard of review of a district court's decision that sufficient evidence exists linking a defendant to a conspiracy for the purpose of Fed.R.Evid. 801(d)(2)(E) remains unclear in this circuit. *See, e.g., United States v. Garza*, 980 F.2d 546, 553 (9th Cir. 1992) (clear error); *United States v. Arias–Villanueva*, 998 F.2d 1491, 1502 (9th Cir. 1993) (de novo review). We need not decide between these standards because, under either, we find that the district court correctly admitted Quinonez's and Castaneda's statements against Casillas, but incorrectly admitted Casillas's statements against Quinonez and Castaneda.

### B. Admission of Casillas's statements against Quinonez and Castaneda.

The government points to six items as independent evidence that provides the required foundation for admission of Casillas's statements against Quinonez and Castaneda. We find this evidence inadequate. Some of the proffered items of evidence are not in fact independent; the remaining ones are of so little probative value that they do not satisfy the government's burden.

First, the government points to a tape-recorded conversation in which Quinonez told Felix, referring to using Castaneda to launder money, "You can go ahead and talk to him, and deal directly with him." It then points to a later conversation, in which Casillas told Felix, "[Quinonez] has called me.... He said, talk with him and reach an agreement." It argues that the similarity between these two statements suggests that Quinonez gave Casillas instructions to deal with Felix,

establishing a connection between Casillas and the Quinonez conspiracy. In actuality, however, any similarity between the statements is irrelevant to the inference the government asks us to draw. Instead, in order to draw this inference, we must accept the second statement—Casillas's out of court testimony—for the truth it asserts: that Quinonez told Casillas to talk to Felix and reach an agreement. It thus is hearsay testimony of a coconspirator, and cannot serve as the required independent evidence of the connection between Casillas and the Quinonez conspiracy. Fed.R.Evid. 801(c).

Next, the government points to a recorded conversation in which Quinonez told Felix that he could help him launder money through the purchase of real estate. It then points to a September 27, 1991 conversation in which Casillas told Felix that Quinonez was still looking for property for Felix to purchase. It argues that the latter statement establishes that Quinonez continued his efforts to help Felix launder his money after August 30, and thus shows he was part of a continuing conspiracy that then included Casillas. Again, however, in order to draw the inference the government desires we must accept Casillas's statement for the truth it asserts—that Quinonez still was looking for property for Felix. As before, this is the hearsay statement of a coconspirator and does not constitute independent evidence.

The next item that the government offers as independent evidence of a connection between Casillas and the Quinonez conspiracy is "the fact that all three appellants are money launderers." This "fact" is irrelevant. Even if all three regularly laundered money over many years, this would not provide any evidence whatsoever that they were all members of the same conspiracy.

Fourth, the government points to the transcript of a September 13, 1991 tape recorded conversation between Casillas and Felix in which it claims Casillas spontaneously offered to help launder money for Felix. Because it is undisputed that Casillas and Felix had only one previous conversation, in which they discussed only real estate, the government contends that Casillas's apparently spontaneous offer to launder money in this second conversation demonstrates that Casillas must have had discussions with Quinonez or Castaneda about the money laundering scheme. The government concludes that this link is the independent evidence of the larger conspiracy it seeks to establish. The government's argument, however, is seriously undermined by the fact that the recording offered in evidence begins after the conversation already was under way. Absent any evidence of what transpired at the beginning of the conversation, there is no reason to believe that Felix did not in fact broach the issue first, and hence no reason to believe that Casillas's interest in laundering money was sparked by Quinonez or Castaneda rather than by Felix. This hardly amounts to the "fairly incriminating" evidence we require. See Silverman, 861 F.2d at 578.

Next, the government points to a recorded conversation in which Casillas displayed awareness that Quinonez had attempted to recruit someone to launder money during the summer of 1991. It contends that this leads "to the inference that Quinonez debriefed Casillas regarding his money laundering scheme," and shows a connection between the two conspiracies. While it is possible to draw this inference from the conversation, it is at least equally possible that Quinonez had merely spoken with Casillas about his (Quinonez's) past activities. If such a conversation occurred, it is entirely consistent with non-conspiratorial behavior on Quinonez's part. Casillas's knowledge is thus insufficient to establish Quinonez's connection with the conspiracy. See id.

The government's final effort to provide independent evidence of a connection between the two conspiracies is its contention that Quinonez was present at a meeting between Casillas, Cordova, and Felix, on November 15, 1991 in which these three conducted several laundering transactions. This depiction of events is not supported by the record. Felix did meet with Casillas and Cordova on that date at the real estate office in which both he and Quinonez worked; and Quinonez did run into Felix at the office on that date. But there is no evidence that Quinonez was present at the time Casillas and Cordova arrived and conducted the mon-

ey laundering transactions. The evidence suggests only that Quinonez noticed Felix waiting alone in Casillas's office, and dropped by to say hello. There is nothing incriminating in that act.

We conclude that there is insufficient independent evidence—admissible against Castaneda and Quinonez—linking them to the Casillas conspiracy for the purpose of admitting Casillas's statements against them pursuant to Fed.R.Evid. 801(d)(3).[1] Because improper admission of hearsay testimony is constitutional error, we must reverse unless the error was harmless beyond a reasonable doubt. *United States v. Bibbero,* 749 F.2d 581, 584 (9th Cir.1984), *cert. denied,* 471 U.S. 1103, 105 S.Ct. 2330, 85 L.Ed.2d 847 (1985).

Here, the only evidence admissible against Quinonez and Castaneda that purportedly links them to Casillas (and thus shows them as members of the single large conspiracy charged in Count 1) are the last four items offered by the government as independent evidence of the conspiracy, discussed *supra.* This evidence is so weak and so equivocal that we cannot conclude beyond a reasonable doubt that the verdict would have been the same had the coconspirator statements properly been excluded. Their convictions of Count 1 cannot stand.[2]

### C. Admission of Quinonez's and Castaneda's statements against Casillas.

Though we find that there is insufficient independent evidence admissible against Quinonez and Castaneda of their participation in a conspiracy with Casillas, the reverse is not true. On September 13, 1991, Casillas and Felix had a tape-recorded conversation in which Casillas offered to help Felix launder money. Casillas told Felix that he already had talked to Quinonez, and that Quinonez had told him to talk to Felix "and reach an agreement." While, as we said above, this statement is inadmissible against Quinonez and Castaneda, it is admissible against Casillas under Fed.R.Evid. 801(d)(2)(A), as an admission of a party opponent. *See United States v. Perez,* 658 F.2d 654, 659 (9th Cir.1981). Viewed in light of the challenged coconspirator statements, we find that this admission provides sufficient independent evidence of Casillas's connection with a conspiracy involving Quinonez and Castaneda to satisfy Rule 801(d)(2)(E).

Having concluded that Quinonez's and Castaneda's statements were properly admitted against Casillas, we find no infirmity in his conviction of Count 1.

### III

Appellants next object that even if the challenged testimony had been admissi-

---

1. In cases where we have determined that the independent evidence was adequate, the evidence has been much more incriminating. *See, e.g., United States v. Crespo de Llano,* 838 F.2d 1006, 1017 (9th Cir.1987) (independent evidence showed defendant present during negotiations for sale of cocaine, obtained sample for government undercover agent to taste, translated price of cocaine from Spanish to English for buyer, and appeared at prearranged location for the cocaine sale); *United States v. Paris,* 827 F.2d 395, 400 (9th Cir.1987) (independent evidence showed that defendant met with intermediary just before latter provided government undercover agent with cocaine sample, and arrived with cocaine at prearranged time and place for sale).

2. The government contends that admission of the coconspirator statements was harmless because even if there is insufficient admissible evidence to convict Quinonez and Castaneda of the larger conspiracy charged, there is overwhelming evidence of two separate conspiracies: one involving Quinonez and Castaneda, and a second involving Casillas, Cordova, and Gutierrez.

A variance between the indictment and the government's proof does not necessarily require

reversal unless it is material. *See Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1934); *Kotteakos v. United States,* 328 U.S. 750, 757, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1945); *United States v. Kenny,* 645 F.2d 1323, 1334 (9th Cir.1981). Here, however, the variance was material, for the jury was instructed that, "if you find that any defendant was not a member of the charged conspiracy, then you must find that defendant not guilty, even though the defendant may have been a member of some other conspiracy." This instruction, which the government does not challenge on appeal, rendered material any variance between the charged larger conspiracy and any smaller conspiracies the government may have proved; the jury was bound to find appellants not guilty if the government's proof of the charged conspiracy failed. The guilty verdicts necessarily mean that the jury convicted Quinonez and Castaneda of the larger conspiracy, for which there was insufficient admissible evidence. *See Yates v. Evatt,* 500 U.S. 391, ——, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991) (juries presumed to follow instructions).

ble, the evidence is insufficient to support their convictions of Count 1, because it remains inadequate to prove the single large conspiracy charged.[3] Evidence is sufficient to support a conviction if, viewing the evidence presented at trial in the light most favorable to the government, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Roston*, 986 F.2d 1287, 1289 (9th Cir.1993). In evaluating the evidence, we consider all of the evidence presented at trial, including the evidence that was improperly admitted. *Bibbero*, 749 F.2d at 586–87. Once a conspiracy has been established, evidence of only a slight connection with it is sufficient to establish a defendant's participation in it. *United States v. Sanchez–Mata*, 925 F.2d 1166 (9th Cir.1991).

■ Here, even if we accept appellants' assertion that the government produced only two statements linking the Quinonez and Casillas conspiracies, we find that those statements alone would permit a rational trier of fact to find a connection between the Quinonez–Castaneda conspiracy and the Casillas conspiracy, and to convict all three appellants of Count 1.

*Statement 1:* Casillas's statement that he had talked to Quinonez and that Quinonez had told him to "reach an agreement" with Felix. Appellants argue that this statement is entirely innocuous, indicating that only that Quinonez had told Casillas—as one competing realtor to another—that it was all right to go ahead and sell Felix real estate, even though Felix initially was Quinonez's client. In context, however, it is plain that Casillas was talking about laundering money, not about legitimate real estate transactions:

> CASILLAS: We're talking about buying checks (unintelligible) and he can tell you how you can do it since he has connections with banks and everything.
>
> NACHO [Felix]: Uh huh.

CASILLAS: But, already [Quinonez] has called me I ... He said, talk with him and reach an agreement. I wanted, if you have some time later, that (unintelligible) I will introduce you to Polo....

Polo,[4] Casillas explained later, "handles a lot of money."

*Statement 2:* Casillas's statement that he had talked to Quinonez and Quinonez was still looking for property for Felix to buy. Appellants argue that this statement also is innocuous. However, viewed in the context of Quinonez's earlier suggestion to Felix that one way to launder money would be for Felix to buy property, we find that a rational juror could have concluded that this was evidence of Quinonez's ongoing participation in a conspiracy that now also involved Casillas.

These statements are sufficiently probative for a rational juror to find appellants guilty of the single conspiracy charged. Consequently, Casillas's conviction is affirmed, and Quinonez and Castaneda, whose conspiracy convictions we have reversed, remain subject to retrial.

## IV

At the close of evidence, the district court denied all three appellants' motions for a judgment of acquittal pursuant to Fed. R.Crim.Proc. 29. Quinonez and Castaneda argue that if the district court had properly excluded Casillas's out-of-court statements, no rational trier of fact could have found the essential elements of the charged conspiracy, and thus the district court erred in denying their Rule 29 motions.[5]

■ We agree that without the improperly admitted evidence no rational trier of fact could have found them guilty of the charged conspiracy. However, it does not follow that the Rule 29 motions were denied erroneously. Our review of the denial of a Rule 29 motion is identical to our review of an appellant's claim that there was insufficient evidence to support his conviction. We must

---

3. Even though we reverse Quinonez's and Castaneda's convictions on evidentiary grounds, double jeopardy considerations require us to reach their sufficiency of the evidence claims as well as Casillas's. *Bibbero*, 749 F.2d at 585–86.

4. Polo is coconspirator Leopoldo Gutierrez.

5. Because we find that Quinonez's and Castaneda's statements were properly admitted against Casillas, this issue is moot as to him.

look to all of the evidence presented at trial, including any evidence subsequently found to have been erroneously admitted. *United States v. Block,* 590 F.2d 535, 543 (4th Cir. 1978); *see also Bibbero,* 749 F.2d at 586. We will affirm the denial of a Rule 29 motion unless we determine that no rational trier of fact could find the essential elements of the crime charged beyond a reasonable doubt. *Roston,* 986 F.2d at 1289. Our conclusion in Part III, *supra,* therefore controls the resolution of this issue. The Rule 29 motions properly were denied.

## V

■ At the close of evidence, the jury was instructed that it could find appellants guilty of the substantive counts charged by finding them vicariously liable for the acts of their coconspirators. *See Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).[6] Quinonez and Castaneda contend that the *Pinkerton* instruction was given in error because there was insufficient admissible evidence to support their conviction of the conspiracy charge on which the instruction is based.[7] We disagree. The district court properly denied their Rule 29 motion for a judgment of acquittal, and so their guilt or innocence of the conspiracy charge was properly before the jury. It follows that the district court could instruct the jury concerning vicarious liability under *Pinkerton,* just as a trial court may in any case where the predicate question of guilt of a charged conspiracy goes to the jury.

This does not mean, however, that the erroneous admission of Casillas's out of court statements may not require reversal of Quinonez's and Castaneda's convictions of the substantive counts. We must ask, as always when the improper admission of evidence is constitutional error, whether absent the inad-missible evidence the verdict would have been the same beyond a reasonable doubt. *Bibbero,* 749 F.2d at 584.

In addition to being instructed as to *Pinkerton* liability, the jury was instructed that it could find Quinonez and Castaneda guilty of the substantive crimes charged as principals or as aiders and abettors. To find them guilty as principals, it was told that it must find that (a) the defendant knowingly conducted or attempted to conduct the money laundering transaction charged, (b) the transaction involved property represented to be the proceeds of an unlawful activity, and (c) the defendant engaged in the transaction with the intent to conceal the nature, location, source, ownership or control of property believed to be the proceeds of that unlawful activity. A person conducts a transaction within the meaning of the statute if he initiates, concludes, or participates in initiating or concluding the transaction. 18 U.S.C. § 1956(c)(2). To find the defendants guilty as aiders and abettors, the jury was told that it must find that (a) the crime was committed, (b) the defendant knowingly and intentionally aided, counseled, commanded, induced, or procured another person to commit the crime, and (c) the defendant acted before the crime was completed.

Thus the jury was instructed on three alternative theories of liability. Because, absent the inadmissible coconspirator statements, the jury could not have convicted Quinonez and Castaneda of the substantive counts on the basis of *Pinkerton* liability, we must reverse unless we find beyond a reasonable doubt that the jury would have convicted them of each substantive count either as aiders and abettors or as principals. We conclude beyond a reasonable doubt that the

---

**6.** The *Pinkerton* instruction read:
[Y]ou may find a named defendant guilty of a substantive count ... if the United States has proved each of the following elements beyond a reasonable doubt.
First, a person named in the substantive count committed the essential elements of the substantive count.
Second, the person was a member of the conspiracy charged in Count 1 of the indictment.

Third, the person committed the substantive count in furtherance of the conspiracy; and
Fourth, the defendant was a member of the same conspiracy at the time the offense charged in the substantive count was committed.

**7.** This issue, too, is moot as to Casillas.

verdicts would have been the same in each instance.

Counts 2–4 charged Quinonez and Castaneda with laundering a total of $25,000 on or about August 20, 1991. These transactions began when Quinonez brought Castaneda to Felix's apartment for the express purpose of obtaining money from Felix for Castaneda to convert into cashier's checks. Both Quinonez and Castaneda were present when Felix revealed that he had purchased some bad coca, establishing that the money was proceeds from drug sales. Both were present when Felix stated that he wanted to conceal his possession of the cash from the government. And both were present when Felix turned over $20,000 to Castaneda, and both Castaneda and Quinonez promised that Casillas would return the following day with cashier's checks. Castaneda returned the next day with three cashiers checks: one for $9,500, one for $10,000, and one for $5,500. Felix gave him his requested commission, plus money to cover the extra $5,000 Castaneda had procured. The transaction involved in Count 5 began when Castaneda picked up another $20,000 to launder on August 22, and ended on August 30 when Castaneda returned with a single cashiers check for $25,000. Once again, Felix paid him his commission plus $5,000 to cover the amount Castaneda had laundered above the cash he had received earlier.

As to Castaneda, there is no doubt that he conducted the transactions charged with the requisite knowledge and intent, and no doubt that the jury would have so found even absent the inadmissible testimony.

As to Quinonez, there is no doubt that the substantive crimes were committed, that he induced and procured Castaneda with the intent that he commit the crimes, and that he acted before the crimes were completed. We therefore conclude beyond a reasonable doubt that the jury would have found Quinonez guilty of all substantive counts at least as an aider and abettor—if not as a principal— even absent the inadmissible coconspirator testimony. The fact that Castaneda ultimately laundered more money than he picked up in Quinonez's presence does not affect our finding concerning Quinonez's lia-

bility. Quinonez procured and induced Castaneda to launder the money, and undoubtedly expected more than the initial $20,000 ultimately to be laundered. For instance, at the meeting when Castaneda collected the first $20,000 to launder, but expressed some hesitance about laundering more money later, Quinonez immediately told Felix, "if he cannot do it, I can get you another person." *Cf. United States v. Barnett*, 667 F.2d 835, 841 (9th Cir.1981) (not necessary that aider and abettor know who actually committed the crime). The fact that Castaneda laundered more money than he left with after the first meeting merely indicates that he did exactly what Quinonez intended. *Id.* (aider and abettor liable for "natural and probable" consequences of his actions).

We conclude beyond a reasonable doubt that the verdicts would have been the same as to each defendant (Quinonez and Castaneda) as to each of the substantive counts, if the coconspirator statements properly had been excluded.

## VI

In sentencing Quinonez and Castaneda, the district court increased their offense levels by three, pursuant to U.S.S.G. § 2S1.1(b)(1), as amended November 1, 1991. Because we reverse their convictions of the conspiracy count, and they are not charged with any substantive crimes occurring after November 1, 1991, on remand the district court should apply the 1990 version of U.S.S.G. § 2S1.1(b)(1). *See United States v. Innie*, 7 F.3d 840, 849 (9th Cir.1993).

## VII

■ Casillas was charged with conspiracy to engage in both money laundering and structuring financial transactions. The jury entered a general verdict that did not distinguish between the two charges. Because the sentencing guidelines mandate different base offense levels for the two offenses charged, the government and Casillas agree that the district court was required to determine which charge he was convicted of for the purpose of determining his base offense level. *See* U.S.S.G. § 1B1.2(d).

Casillas objected to the recommendation contained in his presentence report that he be sentenced under the money laundering guidelines. In this circumstance, Fed. R.Crim.Proc. 32(c)(3)(D) requires the district court to make factual findings, on the record at the time of sentencing, as to this disputed issue. *See United States v. Fernandez-Augulo*, 897 F.2d 1514, 1516 (9th Cir.1990) (*en banc*). Casillas contends that the court failed to do so, and hence that we must remand for resentencing. This contention is groundless.

At Casillas's sentencing hearing, his lawyer renewed his objection to using money laundering, rather than structuring, to determine Casillas's base offense level. The judge, quite evidently in response, stated he was "satisfied that this is a laundering transaction, not a money structuring...." This statement is a sufficiently clear factual finding to satisfy the requirements of Rule 32.

However, Casillas's presentence report does not show an attachment containing written findings, as also required by Rule 32. Therefore, while we affirm Casillas's sentence, we instruct the district court to transmit to the Bureau of Prisons a new copy of the presentence report with the required factual findings attached. *See United States v. Houtchens*, 926 F.2d 824, 828–29 (9th Cir. 1991) (as long as court made findings on record, failure to attach written findings to presentence report does not require resentencing).

### CONCLUSION

We AFFIRM Casillas's conviction and sentence as to all counts. The district court is ordered to transmit to the Bureau of Prisons an amended copy of Casillas's presentence report with factual findings that he was convicted of money laundering attached.

We REVERSE Quinonez's and Castaneda's convictions of Count 1, AFFIRM their convictions of Counts 2–5, VACATE their sentences, and REMAND for resentencing.

No. 92–10734 AFFIRMED. Nos. 92–10722 and 92–10728 AFFIRMED IN PART AND REVERSED IN PART; REMANDED.