UNITED STATES of America, Plaintiff–Appellee,

v.

Francisco JIMENEZ RECIO, Defendant–Appellant.

United States of America, Plaintiff–Appellee,

v.

Adrian Lopez–Meza, Defendant–Appellant.

Nos. 99–30135, 99–30145.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 6, 2000

Filed Sept. 27, 2000

Amended July 31, 2001

M. Karl Shurtliff, Pike & Shurtliff, Boise, Idaho, for defendant-appellant Jimenez Recio; Thomas A. Sullivan, Wiebe & Fouser, Caldwell, Idaho, for defendant-appellant Lopez–Meza.

Alan Burrow (argued), Assistant United States Attorney, Department of Justice, Boise, Idaho; Kim R. Lindquist (briefed), Assistant United States Attorney, Department of Justice, Boise, Idaho, for the plaintiff-appellee.

Before: JAMES R. BROWNING, B. FLETCHER, and RONALD M. GOULD, Circuit Judges.

Opinion by Judge JAMES R. BROWNING; Concurrence by Judge BETTY B. FLETCHER; Dissent by Judge RONALD M. GOULD

## ORDER AND AMENDED OPINION

JAMES R. BROWNING, Circuit Judge:

### ORDER

This court's opinion and the accompanying dissent filed September 27, 2000, are hereby amended. The amended opinions are filed simultaneously with this order, along with a separate concurrence by Judge B. Fletcher.

### OPINION

Francisco Jimenez Recio and Adrian Lopez–Meza appeal their convictions of conspiracy to possess with intent to distribute a controlled substance. Jimenez Recio also appeals his conviction for possession with intent to distribute.

Jimenez Recio and Lopez–Meza were arrested for their part in transporting a truck load of marijuana and cocaine, valued at an estimated $12 million. The original driver of the truck had been arrested earlier that day, along with a companion, Arce. Arce agreed to cooperate with the police and contacted other members of the drug conspiracy to have someone sent to

retrieve the truck, which had been parked at a mall in Nampa, Idaho. Jimenez Recio and Lopez–Meza appeared at the mall a few hours later. They left separately, with Jimenez Recio driving the truck and Lopez–Meza driving the car that had brought them.

■ Both argue the district court should have granted their motion for judgment of acquittal after both the first and second trials under *United States v. Cruz,* 127 F.3d 791, 795 (9th Cir.1997), in which we ruled that a defendant could not be charged with conspiracy to distribute illegal drugs when the defendant was brought into the drug scheme only after law enforcement authorities had already intervened, and defendant's involvement was prompted by the intervention.

In *Cruz,* two individuals on their way to Guam to deliver methamphetamine were arrested, and their drugs confiscated. *Id.* at 794. Because Cruz was lured into taking over the delivery through a government "sting," we held the evidence was insufficient for a rational jury to have found, beyond a reasonable doubt, that Cruz's involvement was part of the original, pre-seizure smuggling conspiracy. *Id.* at 796.

Viewing the evidence in the light most favorable to the government as we must, *see United States v. Yossunthorn,* 167 F.3d 1267, 1270 (9th Cir.1999), we must determine whether any rational jury could find, beyond a reasonable doubt, that Jimenez Recio and Lopez–Meza were involved in the conspiracy prior to the initial seizure of the drugs on November 18, 1998. We focus on the evidence presented at their second trial.[1]

The district court held, and the government argues, that there was some evidence tying Lopez–Meza and Jimenez Recio to the conspiracy before the drugs were initially seized. The district court stated that "Lopez's and [Jimenez Recio]'s words and conduct, upon their picking up the truck in Nampa and subsequently being stopped by the authorities, provided a probative link between themselves and the specific conspiracy charge." Further, before the initial seizure, both Jimenez Recio and Lopez–Meza allegedly called the same telephone number in Idaho and different numbers in Chicago using pre-paid calling cards.

This is insufficient evidence of guilt. Nothing Defendants said or did on November 18, 1998 directly links them to the pre-seizure conspiracy. That Jimenez Recio and Lopez–Meza lied to officers upon arrest points only to knowledge that they were involved in illicit activity at that time and provides no basis for concluding that they were involved in the conspiracy beforehand. There is also no proof that Jimenez Recio and Lopez–Meza used the pre-paid calling cards; anyone could have used them by dialing the pin number code. In fact, it is clear that at least two of the calls on Lopez–Meza's card *were* made by someone else. The government produced no evidence identifying the participants in or the contents of the conversations. The

---

1. The second trial included substantially all the evidence at the first trial as well as additional testimony analyzing telephone records and the opinion of a government expert that the conspiracy was a large operation. Because we conclude this evidence was insufficient, the same would apply *a fortiori* to the evidence at the first trial. In fact, it is unclear whether we could properly review the sufficiency of the evidence at the first trial.

*Cf. United States v. Sarkisian,* 197 F.3d 966, 985 n. 7 (9th Cir.1999) (reserving the question of whether the sufficiency of evidence in an initial mistrial is reviewable on appeal from conviction at second trial); *compare United States v. Gulledge,* 739 F.2d 582, 584 (11th Cir.1984) (suggesting in dicta evidence would be reviewable), *with United States v. Kimberlin,* 805 F.2d 210, 231 (7th Cir.1986) (suggesting the contrary).

phone numbers called are not probative of a conspiracy: The Idaho calls were to "Nu Acres," where the drugs were apparently destined, but the number called was a communal telephone at a migrant camp where Lopez–Meza lived. The Chicago calls were all to different telephone numbers.

The other evidence of Defendants' pre-seizure involvement in the conspiracy is also insufficient. The government argues that Jimenez Recio's renewal of his "non-owner" driver's insurance shortly before his arrest demonstrates his anticipation of driving the drug-laden truck; yet, the government expert testified that Jimenez Recio would not have been involved in the delivery the following day absent the government "sting," and thus could not have anticipated being called on to drive. As for the pagers they carried, one would expect whoever recruited them to have outfitted them with the standard equipment used in the trade. Indeed, in light of the strange turn of events this drug shipment had taken, the main conspirators would want to stay in especially close communication with their drivers [2]

On the other hand, there is strong evidence that Lopez–Meza and Jimenez Recio were not involved in the pre-seizure conspiracy. The government's main witness, Arce, had never met either Lopez–Meza or Jimenez Recio before the drugs were seized. Once the police decided to continue the drug operation, Arce called an Arizona pager number to arrange for a drop-off, but neither Lopez–Meza nor Jimenez Recio were among the three callers who responded to the page. One of the callers returning the page stated that he would send a "muchacho" ("boy" in Spanish) to get the truck, suggesting that Defendants were simply drivers hired at the last minute.[3] Furthermore, the initial conspiracy did not envision a drop-off in the Karcher Mall parking lot where Lopez–Meza and Jimenez Recio retrieved the truck—the police initiated the arrangement to meet there as part of their post-seizure "sting" operation. Indeed, Arce and the government's own expert testified that Arce and Sotello, the original driver, would have driven the drug truck to the Nu Acres "stash house" themselves had they not been stopped and arrested. Taken as a whole, the evidence was insufficient for a rational jury to conclude beyond a reasonable doubt that Defendants were involved in the conspiracy to deliver the drugs prior to the initial seizure of the truck.

The government also relied on an additional broader conspiracy theory to circumvent *Cruz* on retrial, providing detailed expert testimony demonstrating that the drug shipment bore the hallmarks of a complex and sophisticated operation that likely involved more than one shipment. However, the limited role Defendants played in the November 18 shipment alone is insufficient to charge them with complic-

---

**2.** The dissent draws from this and other evidence a series of inferences that reasonable jurors could reach. Review of the evidence in the light most favorable to the government must still meet the requirement of proof beyond a reasonable doubt. Where, as here, the evidence is inherently ambiguous, it is not enough that a jury could reasonably reach certain inferences if reasonable doubt as to a different conclusion cannot be dismissed.

**3.** The government expert credited Arce's testimony that Arce had been similarly recruited at the last minute. Therefore, the general inference drawn by the dissent "that co-conspirators would not entrust such a large value of drugs to a person not integrally involved in the conspiracy" would seem less applicable to this conspiracy. In any case, Lopez–Meza's familial ties to his uncle "Raul," a seemingly central figure in the case, provide an equally plausible explanation for the apparent trust placed in Lopez–Meza (and by extension Jimenez Recio).

ity for any prior loads. *Cf. United States v. Umagat,* 998 F.2d 770, 773–774 (9th Cir.1993) (minor role of defendants in single transaction does not permit imputed liability for the broader conspiracy). Therefore, this theory too hinges on proof of prior involvement.

The strongest evidence that Defendants might be repeat players in drug trafficking were the multiple receipts for expired non-owner insurance policies found on Jimenez Recio. This suggests he habitually drove vehicles he did not own, from which a jury could further infer that Jimenez Recio regularly drove drug trucks for the conspiracy. It is a close question as to whether this inference, in conjunction with the other circumstantial evidence, could suffice to eliminate reasonable doubts among rational jurors as to Jimenez Recio's guilt (and by extension, perhaps Lopez–Meza's as well).

Ultimately, however, we remain unpersuaded. The insurance can also be accounted for by alternative explanations. For example, Jimenez Recio might work as a driver for legitimate businesses. The trafficking conspirators might naturally have turned to such an individual once Sotello was arrested (assuming alternate drivers within the conspiracy were unavailable).[4] Jimenez Recio was also an illegal immigrant. As such, he would be reluctant to testify as to his legitimate work, lest he jeopardize his employers and his own future employment; this could explain the defense's silence on the matter.[5]

As for Lopez–Meza's multiple links to his uncle Jose Meza (a.k.a "Raul") and to Nu Acres, the "stash house" where both Lopez–Meza and Jose Meza apparently lived at times, these are hardly probative of nefarious activity. Much of the dissent's reasoning from these facts amounts to guilt-by-association. If Lopez–Meza indeed lived at Nu Acres, so did many other immigrants. His presence on the scene and familial ties to Jose Meza just as readily support the theory that he was simply a convenient substitute recruited at the last minute.

We need now only address those claims relevant to Jimenez Recio's conviction at the first trial of possession with intent to distribute a controlled substance.

■ The district court did not err by allowing evidence of the odor of burned marijuana in Lopez–Meza and Jimenez Recio's blue Mazda. The evidence was relevant to the charge that Jimenez Recio possessed marijuana with intent to distribute. *See United States v. Mayans,* 17 F.3d 1174, 1181 (9th Cir.1994). One of the primary issues was whether Jimenez Recio knew there were narcotics in the flatbed truck when he and Lopez–Meza retrieved it. The fact that their own car reeked of marijuana makes it more likely that Jimenez Recio was familiar with the odor and knew they were in possession of marijuana.

■ The district court did not err by denying Defendants' motion for a mistrial based on the prosecutor's reference to a

---

4. Although the record is not clear as to size of the truck in this case, it is described variously as a "flat-bed" or "construction truck," suggesting that it is at least somewhat larger than the average consumer vehicle. If so, the need for a driver with a particular expertise in driving such trucks would be evident.

5. Testimony from the immigration agent that he had never seen such a policy carried by an

illegal immigrant before is irrelevant. The government expert on drug trafficking notably omitted any mention of the insurance as common in that context either. If, as the dissent observes "[e]ven drug-trafficking conspirators, it seems, want insurance," the same can be said of illegal immigrants, and for the same reason.

"stash house." Since the government had referred to the Nu Acres residence as the ultimate destination of the drugs without objection, it was not particularly prejudicial for the prosecutor to refer to that residence as a "stash house." Although the prosecutor violated the court's instruction not to use the term, the prosecutor's misconduct does not require reversal since nothing in the record suggests the jury's verdict was affected by its use.

The district court did not abuse its discretion in admitting the expert testimony of Special Agent Hinton. It did not exceed the boundaries set by the district court or by Federal Rules of Evidence Rule 702.

▮ Finally, Jimenez Recio's counsel's failure to move for acquittal on Count Two, possession with intent to distribute, after the first trial constituted ineffective assistance of counsel. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Ordinarily, we do not reach claims of ineffective assistance of counsel on direct appeal, and only do so in habeas corpus proceedings. *See United States v. Ross,* 206 F.3d 896, 900 (9th Cir.2000). However, we review ineffective assistance claims where the record is "sufficiently developed to permit review and determination of the issue" or where "the legal representation is so inadequate that it obviously denies a defendant his Sixth Amendment right to counsel." *Id.* (quoting *United States v. Robinson,* 967 F.2d 287, 290 (9th Cir.1992)).

▮ The government's concession in its brief regarding the motion for judgment of acquittal provides such a record: "The Government agrees with the first premise, namely, that had Appellant's trial counsel

made the motion for judgment of acquittal as to Count Two, the trial judge would have granted sua sponte the new trial as to both counts, as he did for codefendant Lopez." This concession makes a sufficient record to find prejudice since all parties agree that Jimenez Recio would have been granted a new trial but for the actions of his counsel. Although the government may not have dismissed the possession with intent to distribute count against Jimenez Recio before the second trial,[6] the fact that Jimenez Recio was denied a new trial constitutes prejudice in its own right.

The conspiracy convictions are reversed and dismissed with prejudice because of insufficient evidence.

**AFFIRMED IN PART, REVERSED IN PART.**

BETTY B. FLETCHER, Circuit Judge, concurring:

I concur in the majority opinion but write separately to make the point that even if the evidence presented at the second trial, when taken in the light most favorable to the government, could (in the view of the dissent) suffice to convict the defendants on the broader conspiracy charge, their convictions should be overturned based on the insufficiency of the evidence at the first trial. At the first trial, the government argued and presented evidence relating solely to the single load conspiracy.[1] It was only after a mistrial was declared that the government argued and presented additional evidence at the second trial relating to the alleged existence of a broader conspiracy. As I explain below, the evidence presented at

---

**6.** The circumstances suggest the government dismissed Count Two against Lopez–Meza only to avoid the incongruity of charging both defendants with conspiracy, but only Jimenez

Recio with possession, although both basically engaged in the same conduct.

**1.** Indeed, the defendants were indicted for conspiracy based only on this theory.

the first trial was plainly insufficient to support a conspiracy conviction under the single load theory in light of our controlling case law.

As the Supreme Court stated in *Burks v. United States*, 437 U.S. 1, 11, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), "[t]he Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." Although it is evident that the defendants' conspiracy convictions were not final (and hence unreviewable by this court) until after the conclusion of their second trial, *see Richardson v. United States*, 468 U.S. 317, 326 n. 6, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984), the defendants moved for acquittal in the district court following each trial based on insufficiency of the evidence. Accordingly, although our circuit has yet to decide whether the sufficiency of the evidence at the first trial is reviewable after the second trial's conclusion, *cf. United States v. Sarkisian*, 197 F.3d 966, 985 n. 7 (9th Cir.1999), I conclude that Jimenez Recio and Lopez–Meza now raise cognizable claims for acquittal based on the insufficiency of the evidence at both their first and second trials.

As the Court stated in *Burks*, "the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient." 437 U.S.

at 18, 98 S.Ct. 2141. Otherwise, "the purposes of the Clause would be negated were we to afford the government an opportunity for the proverbial 'second bite at the apple.'" *Id.* at 17, 98 S.Ct. 2141. Indeed, "the prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble." *Id.* at 16, 98 S.Ct. 2141.

In *Burks*,[2] the Court further held that "[i]t cannot be meaningfully said that a person 'waives' his right to a judgment of acquittal by moving for a new trial." *Id.* at 17, 98 S.Ct. 2141. Moreover, "it should make no difference that the *reviewing* court, rather than the trial court, determined the evidence to be insufficient.... [Such an] appellate decision unmistakably mean[s] that the District Court ... erred in failing to grant a judgment of acquittal. To hold otherwise would create a purely arbitrary distinction between those in [the defendants'] position and others who would enjoy the benefit of a correct decision by the District Court." *Id.* at 11, 98 S.Ct. 2141 (emphasis original). It would be similarly irrational to conclude here that because Jimenez Recio and Lopez–Meza were barred until now from appealing the district court's denial of their motion for acquittal after the first trial, they have somehow "waived" their right to mount such a challenge.

**2.** *Richardson* did not overrule *Burks* with respect to the ability of an appellate court to review the sufficiency of the evidence at the first trial. *Richardson* held only that the Double Jeopardy Clause does not bar a retrial after the first trial ends in a hung jury. *Richardson*, 468 U.S. at 325–26, 104 S.Ct. 3081. Indeed, the *Richardson* Court took pains to distinguish the procedural posture of that case from the one in *Burks*, and to reconcile the two holdings. *See, e.g., id.* at 324, 104 S.Ct. 3081 ("We are entirely unwilling to ... extend[ ] the reasoning of *Burks*, which arose out of an appellate finding of insufficiency of

evidence to convict *following a jury verdict of guilty*, to a situation where the jury is unable to agree on a verdict.") (emphasis added); *id.* at 326, 104 S.Ct. 3081 ("a trial court's declaration of a mistrial *following a hung jury* is not an event that terminates the original jeopardy to which petitioner was subjected") (emphasis added). The *Richardson* holding is therefore inapposite to the present case, since here the jury returned guilty verdicts against Jimenez Recio and Lopez–Meza at their first trial, prior to the district court's declaration of a mistrial.

I would therefore recognize and decide this case on the defendants' respective claims that the government presented insufficient evidence at the first trial. As the majority opinion aptly reasons,[3] the government's case with respect to the single load conspiracy cannot withstand *United ed States v. Cruz*, 127 F.3d 791 (9th Cir. 1997). Critically, the government's own expert, Agent Hinton, as well as its star witness, Arce, testified that but for the government's intervention, Arce and Sotelo would have driven the truck themselves to the putative "stash house" at Nu Acres. Furthermore, the only evidence in the record of any pre-seizure involvement on the part of Jimenez Recio and Lopez–Meza consisted of a handful of phone calls, for which there was uncontroverted evidence that some of the calls made on the phone card possessed by Lopez–Meza could not possibly have been made by him. The conclusion is therefore inescapable that the defendants would almost certainly not have been involved in the transaction were it not for the government's intervention.

Put another way, any communication which may have taken place between Jimenez Recio, Lopez–Meza, and the central traffickers before the drug seizure could not have contemplated a role for them in delivering these drugs. If anything, such evidence may be probative of involvement in a broader conspiracy (as argued by the government at the second trial), but not in the single transaction. The government's *post*-seizure evidence notwithstanding (e.g., more phone and pager calls to and from Jimenez Recio and Lopez–Meza; the defendants' behavior at the Karcher Mall and at the time of arrest; and Jimenez Recio's purchase of non-owner insurance),

this does not amount to evidence beyond a reasonable doubt of *pre*-seizure involvement on the part of the defendants, at least with respect to the single load transaction.

In sum, the unavoidable inference that Jimenez Recio and Lopez–Meza would not have been involved in the transaction had the original delivery proceeded as planned precludes a finding of conspiracy beyond a reasonable doubt. Inasmuch as we are bound by *Cruz*, as the dissent concedes, *see infra* Dissenting Op. 1079 n.2, we have no choice but to reverse.[4] I therefore would overturn the defendants' convictions based on the insufficiency of the government's case at the first trial alone.

Having said this, however, I also concur in the majority holding that the evidence presented at the second trial was again insufficient to convict the defendants beyond a reasonable doubt. To be sure, in my opinion, this is a closer call; the dissent correctly notes that the government presented more detailed evidence of phone and pager calls that may have involved Lopez–Meza, Jimenez Recio, Jose Meza (a.k.a.Raul), and others. Other circumstantial evidence—such as Jimenez Recio's purchase of non-owner's insurance, Lopez–Meza's connection to his uncle Raul, the value of the drugs transported, and Agent Hinton's testimony as to the likely sophistication and complexity of the drug operation—could militate in favor of a finding that the defendants may have been involved in an ongoing drug trafficking scheme. However, as the majority opinion properly reasons, precedent again prevents our finding the defendants guilty beyond a reasonable doubt of participation in a broader conspiracy. *See United*

---

**3.** Such reasoning with respect to the single load theory applies to both the first and second trials.

**4.** Tellingly, apart from a brief footnote, the dissent's analysis avoids any mention of *Cruz* whatsoever.

*States v. Umagat,* 998 F.2d 770 (9th Cir. 1993).

Under *Umagat,* the relatively minor role played by "mules" such as Jimenez Recio and Lopez–Meza does not justify imputing to them knowledge of and responsibility for a broader conspiracy. Notably, in *Umagat,* the government identified and proved the existence of four separate drug transactions; here, the government could not identify any transactions beyond the single load, much less demonstrate knowledge or participation in them by either defendant. Indeed, the bulk of the evidence presented by the government speaks only to the likelihood that a complex operation existed. It says nothing about whether bit players like Jimenez Recio and Lopez–Meza knew of and should be held responsible for involvement in other trafficking offenses. Significantly, the dissent omits virtually any discussion of *Umagat.*

Accordingly, I concur in the majority opinion.

RONALD M. GOULD, Circuit Judge, dissenting:

## I. PROCEDURAL BACKGROUND

Jimenez Recio and Lopez–Meza proceeded to trial ("first trial") on counts of (1) conspiracy to distribute cocaine and/or marijuana, and (2) possession with intent to distribute cocaine and/or marijuana. The jury returned guilty verdicts on both counts. Lopez–Meza moved for judgment of acquittal on both the conspiracy count and the possession count under Federal Rule of Criminal Procedure 29(c). Jimenez Recio moved for judgment of acquittal on the conspiracy count also pursuant to Rule 29(c).[1] Both defendants argued that the evidence presented at trial was insufficient for a reasonable jury to reach a finding of guilt beyond a reasonable doubt. The district court denied the motions, but found sufficient error in the proceedings *sua sponte* to convert the Rule 29(c) motions into motions for a new trial pursuant to Federal Rule of Criminal Procedure 33. The district court then granted the motions for a new trial, vacated the convictions from the first trial, and ordered a second trial on the conspiracy count for both Jimenez Recio and Lopez–Meza, a second trial on the possession count for Lopez–Meza, and sentencing on the possession count for Jimenez Recio.

The case proceeded to trial again ("second trial"). Jimenez Recio and Lopez–Meza were re-tried on the conspiracy count. The government dropped the possession count against Lopez–Meza. The jury returned guilty verdicts, and Jimenez Recio and Lopez–Meza again moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c), contend-

---

1. The court today in part holds that Jimenez Recio's counsel was ineffective for failure to move for acquittal on Count Two after the first trial. I conclude that we should not reach Jimenez Recio's claim of ineffective assistance of counsel in the first trial. We ordinarily do not reach ineffective assistance of counsel claims on direct appeal. See *United States v. Pope,* 841 F.2d 954, 958 (9th Cir. 1988). Such claims normally should be raised in habeas corpus proceedings, which permit counsel "to develop a record as to what counsel did, why it was done, and what, if any, prejudice resulted." *Id.* There are two exceptions to this general rule: (1) if the record is sufficiently developed to permit review and determination of the issue, or (2) where the legal representation is so inadequate that it obviously denies a defendant his Sixth Amendment right to counsel. See *United States v. Ross,* 206 F.3d 896, 900 (9th Cir.2000). Here, the record lacks any mention of Jimenez Recio's lawyer's reasons for failing to make the motion. Also, Jimenez Recio's legal representation was not so inadequate that it obviously denied him a Sixth Amendment right to counsel. I would not reach Jimenez Recio's ineffective assistance of counsel claim. But if reached on this record, I would deny it.

ing that the evidence presented in the second trial was insufficient for a reasonable jury to reach a finding of guilt. The district court denied the motions.

The court today reverses the convictions from the second trial, holding that the government presented insufficient evidence in the second trial. I respectfully dissent because I take a different view of the evidence, under the proper legal standards. This case poses an important issue concerning the scope of reasonable inferences that may be drawn by a jury from evidence of criminal conspiracy. I respectfully dissent because I would hold that there was unmistakably more than sufficient evidence in the second trial to uphold the jury's verdict. The majority today errs on this crucial issue, and then does not reach the other issues presented by the parties regarding the second trial. Having also reviewed these other issues, I would affirm the district court's decision to deny the defendants' motions for a judgment of acquittal after the second trial, and let the jury verdict stand.

## II.  FACTUAL BACKGROUND

On November 18, 1997, a Nevada police officer stopped a white flatbed truck occupied by Manuel Sotelo ("Sotelo") and Ramiro Arce ("Arce"). After a consent search the police found 369 pounds of marijuana and 14.8 pounds of cocaine. When questioned, Sotelo and Arce indicated that they did not know about the drugs and were merely driving the truck to Idaho where they had been instructed to leave it parked at the Karcher Mall.

The government's law enforcement agents then permissibly set up a sting. On November 19, 1997, the government placed the truck, still containing most of the drugs, at the Karcher Mall. Arce used a cellular phone to call a pager number that he had previously used to make arrangements for the pickup of the truck.

When someone called back, Arce described the truck's location to the unknown caller. The unknown caller stated that "he was going to call a muchacho to come and get the truck."

About three hours later, a blue car driven by Lopez–Meza pulled up to the truck and stopped. Jimenez Recio left the car and entered the truck. Both vehicles proceeded to drive west on different back roads. The police then stopped each vehicle, whereupon each occupant told the police a different and fabulously incredible story. The police smelled marijuana in the car that Lopez–Meza had been driving. The police also found cell phones, phone cards and pagers on both defendants. The police then arrested Jimenez Recio and Lopez–Meza.

Subsequently, Arce pled guilty and testified against Jimenez Recio and Lopez–Meza at trial.

## III.  DISCUSSION

### A.  Sufficiency of the evidence

We must review the evidence that was presented at the second trial against Jimenez Recio and Lopez–Meza in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Yossunthorn,* 167 F.3d 1267, 1270 (9th Cir.1999). "Once a conspiracy exists, evidence establishing beyond a reasonable doubt defendant's connection with the conspiracy, even though the connection is slight, is sufficient to convict defendant of knowing participation in the conspiracy." *United States v. Bautista–Avila,* 6 F.3d 1360, 1362 (9th Cir. 1993) (citations and quotation marks omitted).

At the second trial, the government presented evidence pursuant to two different

conspiracy theories. First, the government argued that Jimenez Recio and Lopez–Meza were involved in a conspiracy to ship the one load of drugs in their possession upon arrest. The government had the burden to establish beyond a reasonable doubt that Jimenez Recio and Lopez–Meza joined or became members of this single-load conspiracy before police officers seized the drugs from Arce and Sotelo at 1:18 a.m. on November 18, 1997. *United States v. Cruz*, 127 F.3d 791, 795 (9th Cir.1997) (conspiracy to distribute illegal drugs ends when law enforcement authorities confiscate the drugs).[2] The government also argued that Jimenez Recio and Lopez–Meza were involved in a broader conspiracy, a conspiracy that was not limited to a single load. Regarding the broader conspiracy, the government bore the burden to prove that Jimenez Recio and Lopez–Meza knew or had reason to know of the broader conspiracy, whether before or after November 18, 1997, and that Jimenez Recio and Lopez–Meza had knowledge or constructive knowledge of the scope of the broader conspiracy and embraced its objectives. *United States v. Umagat*, 998 F.2d 770, 772–773 (9th Cir. 1993)

When we view the evidence here in the light most favorable to the government, a reasonable jury could have found, beyond a reasonable doubt, that there was sufficient evidence linking Jimenez Recio and Lopez–Meza to a conspiracy that ended when police officers seized the drugs from Arce and Sotelo at 1:18 a.m. on November 18, 1997. Moreover, a reasonable jury could have found evidence sufficient to show constructive knowledge on the part of Jimenez Recio and Lopez–Meza of a broader conspiracy involving more loads than that seized on November 18, 1997.

SINGLE–LOAD CONSPIRACY:

The following evidence was presented at trial from which a jury reasonably could conclude that Jimenez Recio and Lopez–Meza were involved in a single-load conspiracy that ended when the drugs were seized on November 18, 1997:

*Jimenez Recio:*

Jimenez Recio told a totally fanciful and incredible story upon his arrest, from which a reasonable jury could draw an inference of guilt. Although police watched Lopez–Meza drop Jimenez Recio off at the mall where he picked up the truck, Jimenez Recio stated that he did not know how he got to the mall. When asked what he had been doing at the mall, Jimenez Recio said that he was shopping, and that he ran into a man who asked him to drive the truck to Jimenez Recio's house for $250, and the man would pick it up later. Although Jimenez Recio's house was a thirty-five to forty-minute drive from the mall on the interstate, Jimenez Recio's explanation for taking a longer back-road route was "I just like to drive in the country." Moreover, while Jimenez Recio told the arresting officer that he was going to his house, when asked the address he first gave one address, then another, then stated that he could not remember the address where he lived. The arresting officer testified that he did not believe that Jimenez Recio told the truth when he was arrested and further testified that based in part on Jimenez Recio's fanciful story, the officer believed that Jimenez Recio knew of the contents of the truck. This story is so unbelievable that a reasonable jury

---

2. This panel is bound by *Cruz* as authoritative precedent. However, for the reasons stated by Judge Hall in dissent in *Cruz*, I believe *Cruz* totally inconsistent with long established and appropriate principles of the law of conspiracy. Though we are now bound by *Cruz*, and the district court was correct to apply it, I believe that it is an ill-advised precedent that our court should overrule en banc at the earliest opportunity.

would almost certainly view it as an implied admission of guilt. Although the majority casually assumes that this implied admission related only to Jimenez Recio's post-seizure crimes without crediting or even discussing all pertinent evidence, the government presented evidence from which a reasonable jury might conclude beyond a reasonable doubt that Jimenez Recio was involved in the conspiracy before the seizure. Thus the majority improperly invades the jury's province.

The government presented evidence that Jimenez Recio was arrested driving a truckload of marijuana and cocaine with a retail value of between $10 and $12 million.[3] An expert on drug trafficking conspiracies testified that the quantity and the value of the drugs found in the truck driven by Jimenez Recio indicated that someone trusted Jimenez Recio enough to let him drive. From this evidence and testimony, a jury might reasonably infer that co-conspirators would not entrust such a large value of drugs to a person not integrally involved in the conspiracy. It is unlikely that the unidentified conspirator on the phone who stated that he would send a "muchacho" would send an outsider to transport such valuable cargo. While there may be other theoretical possibilities, a jury reasonably could infer that the conspirators would send someone highly trusted, familiar with the conspiracy's scope and involved in the plan of illicit drug distribution.

Moreover, Jimenez Recio carried a pager with him when he was arrested driving the truck, and Arce and Sotelo, co-conspirators arrested on November 18, 1997 at 1:18 a.m., were found carrying two pagers and a cell phone. A government expert witness testified that lots of communica-

tion is necessary to move drugs, and the way traffickers use communications demonstrates how communications can be kept secret, and secrecy is necessary. The expert testified that communication devices typically used by complex drug organizations are cell phones and pagers because the users of these devices can be physically located anywhere, untraceable by the authorities. When viewed in the light most favorable to the government, a jury reasonably might conclude that, because Jimenez Recio was found in possession of more than $10 million worth of marijuana and cocaine, Jimenez Recio's pager is evidence that he was involved in a drug conspiracy insofar as testimony demonstrated that the mode of communication among the conspirators in this larger conspiracy was via pagers and telephone calls.

It is one thing to say that ubiquitous pagers used by messengers, executives, workers, and professionals are not in themselves evidence of participation in a drug conspiracy when found in usual settings, but it is quite another thing to say that multiple pagers in the hands of persons found astride a truckload of marijuana and cocaine valued beyond $10 million by one witness are irrelevant, particularly where coconspirators Arce and Sotelo were also found with pagers. A key point ignored by the majority is the expert testimony linking pagers to drug conspiracies, testimony that a jury could have properly given weight. To disparage the pager testimony from an appellate distance is merely to argue about the weight of the evidence. This we cannot do because we must view the evidence in the light most favorable to the government.

---

3. One witness testified that the drugs were valued between $10 and $12 million while another witness placed value between $1 and $2 million. Because a reasonable jury could have credited the testimony valuing the drugs between $10 and $12, I refer to these amounts in support of the verdict.

Perhaps more importantly, Jimenez Recio carried a non-owned named operator insurance policy in his jacket pocket when he was arrested. Such a policy insures vehicle operation by a non-owner of that vehicle. An agent testified that during his 25–year career as an immigration agent which involved several thousands of arrests, he had never encountered a policy like the one Jimenez Recio owned. The government presented evidence demonstrating that Jimenez Recio renewed the policy between November 2, 1997 and the date of Jimenez Recio's arrest, at most two weeks before the drugs were seized and at most two weeks before he was arrested driving a truck he did not own loaded with more than $10 million of marijuana and cocaine. In the light most favorable to the government, a reasonable jury might infer that this was not "coincidence," and, instead, that Jimenez Recio purchased the insurance policy in the days leading up to the seizure because he knew then that his job in the conspiracy was to drive a truck that he did not own carrying the marijuana and cocaine. Even drug-trafficking conspirators, it seems, want insurance.

Finally, and perhaps most importantly, the government presented evidence that a pin number associated with a telephone card that Jimenez Recio carried when he was arrested had called a number associated with a place called "Nu Acres" on November 15th and 17th. The government also presented evidence that the Nu Acres number was associated with a cell phone used by Lopez–Meza and a man named Raul. Co-defendant Arce, who had turned on the conspiracy by cooperating in the government sting, testified that Sotelo mentioned the name "Raul"[4] during a

phone conversation about the drug shipment before the seizure. The government presented evidence that a phone card that Lopez–Meza carried when he was arrested also called Nu Acres on November 14 and 17. Finally, the government presented evidence from which a jury could reasonably infer that the Nu Acres residence was the destination of the drug shipment, in part because of geographical location and in part because the Nu Acres number was the number called right before the sting. An agent testified that the fact that Jimenez Recio's phone card was used to call Nu Acres before the seizure and that the same number was called right before the sting, suggests that Jimenez Recio knew the people living at Nu Acres, the destination of the drugs. From this evidence, a jury reasonably could infer that Jimenez Recio made these two calls to Nu Acres and possessed knowledge of the conspiracy and its members before the date the drugs were seized.

The evidence of the phone calls to Nu Acres and the non-owner operator insurance policy combined with probative evidence of Jimenez Recio's incredible story upon arrest, the use of pagers and the very high value of the drugs in the truck, is solid evidence when viewed in the light most favorable to the government; it is clearly sufficient for a reasonable jury to have found beyond a reasonable doubt that Jimenez Recio was involved in the conspiracy before the seizure of the drugs.

*Lopez–Meza:*

The situation with Lopez–Meza is much the same as with Jimenez Recio. Lopez–Meza told a different but equally bizarre and incredible story upon arrest. He told

---

**4.** There is testimony in the second trial from which the jury easily could conclude that "Raul, aka" "Jose Meza" was a key player in the larger conspiracy. This included evidence that he was the uncle of Lopez–Meza,

that he resided at Nu Acres, the destination for the drugs, and that his name was mentioned by co-conspirator Sotelo while discussing the drugs.

the police that he lived with his girlfriend, but he did not know her last name. When asked what he was doing that night, Lopez–Meza denied that he had been to the mall, and said he was "out driving around" and that he was going to see his girlfriend. When asked where she lived, however, Lopez–Meza stated that he did not even know the location of the city where his girlfriend lived. An officer testified that he did not believe that Lopez–Meza told the truth. Again, the majority apparently concludes that this implied admission of guilt merely evidences post-seizure guilt, but the government presented sufficient evidence that Lopez–Meza, like Jimenez Recio, was involved in the conspiracy before the seizure. Lopez–Meza was arrested carrying two pagers and two phone cards, and with Jimenez Recio was involved transporting an exceptionally high value of marijuana and cocaine. Again, given the expert testimony demonstrating the significance of these communication devices and the high value of the drugs, it seems almost certain, and at least a jury reasonably could infer, that the conspirators sent Lopez–Meza because he was trusted and involved.

The government also put forth evidence connecting Lopez–Meza to a man named Raul, a man who, during the time-frame at issue in this case, lived at Nu Acres, the place proffered by the government as the destination of the drugs and the target of the conspirators' frequent cell phone calls. Mireya Alvarez testified that Lopez–Meza' uncle was named Jose Meza, and an agent testified that Jose Meza was also known as Raul. Mireya Alvarez also testified that Lopez–Meza and Jose Meza sometimes lived under the same roof and shared use of a cell phone in her possession. The government presented evidence that this cell phone was the Nu Acres number. Arce testified that Sotelo mentioned "Raul" in a cell phone conversation regarding the drug shipment before the sting.

Arce also testified that after the sting, Arce, Sotelo, Lopez–Meza and Jimenez Recio spoke while in jail and Lopez–Meza mentioned Raul "as a part of this case." When this connection between Lopez–Meza and Raul and Nu Acres is viewed in the light most favorable to the government, a reasonable jury certainly could connect Lopez–Meza to the conspiracy before the seizure of the drugs.

Beyond Lopez–Meza's connection to Raul, the government presented through phone-toll records and testimony regarding those records, that Lopez–Meza, like Jimenez Recio, was connected to and had knowledge of the other conspirators before the seizure of the drugs. A phone card found in Lopez–Meza' possession when he was arrested called Nu Acres on November 14, again on November 15, again on November 17, 6 minutes before Jimenez Recio called the same number, and again on November 18. For the same reasons Jimenez Recio's two calls to Nu Acres preceding the sting demonstrate Jimenez Recio's prior knowledge of the conspiracy and its members, Lopez–Meza' four calls preceding the sting demonstrate his.

The connection between Lopez–Meza, Raul and Nu Acres, the drug's destination, the evidence of Lopez–Meza's implausible story, his two pagers and two phone cards, and his participation in the transportation of more than $10 million of marijuana and cocaine, together demonstrate that a reasonable jury could determine Lopez–Meza's participation in the pre-seizure conspiracy beyond a reasonable doubt, and in my view this evidence is more than sufficient to permit a jury verdict of conviction in the second trial.

BROADER CONSPIRACY:

Moreover, the government presented more than ample evidence from which a reasonable jury could have found constructive knowledge on the part of Jimenez

Recio and Lopez–Meza of a conspiracy involving more loads than the one seized on November 18, 1997. This evidence, not surprisingly, is circumstantial, but of course, conspirators do not often explicitly proclaim their knowledge of covert illegal operations. The majority does not even discuss this evidence.

Special Agent Anthony Hinton ("Agent Hinton") of the DEA, qualified by the government as an expert on identifying and investigating drug organization, testified about factors that characterize complex drug organizations. He testified that the drug organization involving Jimenez Recio and Lopez–Meza was large, complex and involved more transactions than the one load of drugs seized by the government. Agent Hinton's testimony was thorough and specific.

First, Agent Hinton testified that the quantity of drugs involved in a drug transaction indicates the level of sophistication of a drug operation: the larger the organization the larger the amount of drugs moved. A large load of marijuana weighs between 100 pounds and a ton. A large load of cocaine weighs between 100 and 200 kilos.

Agent Hinton also testified that when the drug shipped is cocaine, the quality of the cocaine indicates the sophistication level of a drug operation: the closer to the top of the organization and the drug production the drug traffickers are, the purer the cocaine. For example, if the cocaine is produced and packaged in Columbia, when it comes directly from Columbia it is still packaged in a pure form and the bricks are not broken up. Agent Hinton noted that the value of narcotics relates directly to purity.

Agent Hinton also testified that the number of players involved in a particular organization indicates the sophistication level of a drug operation: the more players involved, the larger the organization.

Further, Agent Hinton testified that the number of transactions indicates the sophistication level of the drug operation: the more transactions, the larger the organization. These factors are linked: the more people involved in an organization, the more capable the organization is to complete more transactions. Also, the agent testified that the purity and quantity of drugs in a given transaction together indicate the complexity of a drug organization: the purer the drugs, the larger the quantity, the more complex the organization.

Further, Agent Hinton testified that the geographic reach of a drug trafficking organization indicates its level of complexity: "[A] smaller organization may have people that can only move drugs to one part of the country but not others. In a larger organization, you will have more people that can specialize in different areas of the country." Agent Hinton explained:

> One of the most difficult parts of the drug trafficking organization is moving its product from the producers to the user. And the most dangerous part of that is actually moving the drugs geographically from one part of the country to another. In that respect, you need people that know what they are doing, how to move drugs from one place to another, and that means you need people that know different parts of the country so that they can move those drugs to different parts of the country.

Agent Hinton also testified that knowledge of individual players in a drug organization varies depending on the size of the organization: In a smaller organization, the players know one another because trafficking involves fewer transactions and fewer people and roles are strictly defined. In a larger drug organization, it would be uncommon for people at the top to know

all of the people in the organization, especially those near the bottom.

Further, Agent Hinton testified that communication among players in a drug trafficking organization indicates the size and nature of the organization:

> To move drugs, there has to be a lot of communication as to when the drugs are moved, how they are moved, quantities that are moved, because, obviously, in a drug organization, their whole purpose is to move an illegal substance. And to be successful at that, they have to be very secret. And the way that they use their communication shows you how they can be secret.

Agent Hinton then testified that the communication devices in the investigation of the drugs seized in this case were phones, cellular telephones, and pagers. Agent Hinton testified that these devices are important indications of the size and scope of the drug trafficking organization here because of the secrecy that such devices provide.

> "The individual using a cell phone can be anywhere at any time when they make the call. When they give out orders, they can be anywhere and nobody else will know where thy are when they are making those calls. They can make a call into a pager. And using the out-of-state area code, for example, to, say, Chicago, they don't have to be in Chicago necessarily, they can be in any area of the country when they make their call into the pager and when a person calls back at that number. [Moreover, with] the use of cellular phones nowadays, you don't have to have real identification to obtain a phone. And the telephone is not in a particular spot that you can trace it back to. Nowadays, you can buy a cellular telephone like you can a phone card [with a certain number of minutes on it, and] when the time's up,

you just toss it, and nobody can trace it back to you."

Agent Hinton further explained that pay telephones are used in the same way as cellular telephones because people do not know where the traffickers live. "If you use pay phones, you can drop in anywhere you want, page someone to your cell phone, page them to the pay phone, they call you back, and you're gone."

After explaining the factors that go into a determination regarding the size and scope of a complex drug trafficking operation, Agent Hinton testified that, in his opinion, the conspiracy here was "a large, complex drug organization ... [t]hat was involved in other loads." The factors that lead him to draw this conclusion, he testified, were

> first ... the fact that the load car was found with [drug] residue in it that did not come from the packages that we seized. They were not open. They had not been cut open or anything. The planks on the back of the truck had been used before. There were numerous other holes in the sides of the truck. Also, because of the fact that there was such a large amount of drugs that were seized in this investigation, because I know that when involved in drug organizations, getting to that quantity of loads is very difficult because it is based on trust, and trust is built over time.

Agent Hinton's opinion that this case, with its massive drug seizure, involved a drug organization that extended beyond the single load seized on November 18, 1997 is not merely common sense; it also is corroborated by other evidence in the record. Strikingly, Lopez–Meza was the nephew of key conspiracy figure Raul. And Jimenez Recio was arrested carrying non-owners vehicle operation insurance, not just covering the time period of the load seized, but also an earlier period of such

insurance coverage that ended on October 2, 1997. Further, Jimenez Recio was arrested carrying twelve receipts corresponding to non-owners operation insurance payments. A jury perhaps might infer from these receipts that Jimenez Recio regularly insured himself while making nefarious deliveries of drugs. But, if more is needed to prove that Jimenez Recio and Lopez–Meza were involved in a larger conspiracy, there was much more including the size and quality of the captured drug shipment; the use of cell phones, pagers, pay phones and phone cards for purposes of coordinated stealth; the geographic reach of the participants in the conspiracy; the truck modifications and marijuana residue suggesting prior illicit shipments; and the expert testimony linking the above evidence to the prototype for major drug conspiracy and suggesting that the conspirators would not entrust $10 million of drugs to persons they did not trust. There was ample evidence for the jury to conclude beyond a reasonable doubt that Lopez–Meza and Jimenez Recio knew of and engaged in the broader conspiracy.

Based on the evidence presented at trial, particularly the expert testimony of Agent Hinton, a reasonable jury could determine beyond a reasonable doubt that the drug trafficking operation here involved more than the single load that was seized. The evidence also demonstrates that Jimenez Recio and Lopez–Meza had actual or constructive knowledge of the conspiracy and its scope. A jury was permitted to credit testimony regarding trust that builds over time, trust among scoundrels necessary for illicit transport of drugs; Jimenez Recio and Lopez–Meza's possession and use of sophisticated drug-trafficking communication devices; and the quantity, quality and value of the drugs seized. This evidence is more than sufficient to permit a jury beyond reasonable doubt to find Jimenez Recio and Lopez–Meza guilty of knowledge and participation in a broad conspiracy.

### B. Other alleged errors

In addition to arguing that the evidence was insufficient to convict, Jimenez Recio and Lopez–Meza make several other arguments to support their contention that the district court erred by denying their motions for judgment of acquittal after they were convicted in a second trial by jury. The majority concludes that evidence of conspiracy was insufficient and does not reach these other issues. Because I view the evidence of conspiracy as more than sufficient, I reach these other arguments, but find them unpersuasive.

Initially, Jimenez Recio and Lopez–Meza assert three grounds of error regarding jury instructions. The first ground is that the district court gave alternative jury instructions, the first for the pre-seizure conspiracy, the second for an alternative larger conspiracy. Lopez–Meza and Jimenez Recio argue that the district court erred by giving two separate conspiracy instructions because, while it gave the jury a general unanimity instruction, it did not instruct the jury that it must unanimously agree on one of the two conspiracy theories.

We review a district court's formulation of jury instructions for abuse of discretion. *See United States v. Beltran–Garcia*, 179 F.3d 1200, 1204 (9th Cir.1999). In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation. *See id.* at 1205. The trial court has substantial latitude so long as its instructions fairly and adequately cover the issues presented. *See United States v. Abushi*, 682 F.2d 1289, 1299 (9th Cir.1982). Jury instructions, even if imperfect, are not a basis for overturning a conviction absent a showing that the district court abused its discretion. *See United States v. de Cruz*, 82 F.3d 856, 864–65 (9th Cir.1996). In *de Cruz*, where the

defendant failed to demonstrate prejudice from an imperfect instruction, we held that the district court did not abuse its discretion. *id.* Further, "the jury must be presumed to have followed [a] unanimity instruction and all agreed to at least one of several possible conspiracies even though no specific instruction was given to that effect." *United States v. Echeverry,* 719 F.2d 974, 975 (9th Cir.1983) (citing *United States v. Friedman,* 445 F.2d 1076, 1084–85 (9th Cir.1971)). Only when there appears to be a genuine possibility that the jury was confused or that a conviction resulted from different jurors concluding that a defendant committed different acts, general unanimity instructions do not suffice. *See Echeverry,* 719 F.2d at 975 (concluding that potential for such confusion exists when the jury presents questions indicating their confusion concerning multiple conspiracies).

Here, Jimenez Recio and Lopez–Meza assert nothing more than the existence of alternative conspiracy instructions to demonstrate the possibility of genuine jury confusion. The presumption that jurors have followed a general unanimity instruction when several possible conspiracies were proffered holds absent evidence that there is "a genuine possibility of jury confusion or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts, the general unanimity instruction does not suffice." *Echeverry,* 719 F.2d at 975. Here, Jimenez Recio and Lopez–Meza have not with any specificity shown true potential for juror confusion. Speculation is inadequate to defeat a presumption that a jury verdict is based on jurors following instructions. Further, Jimenez Recio and Lopez–Meza have not demonstrated prejudice from the lack of a more particularized jury instruction. The district court did not abuse its discretion by failing to give a more particularized jury instruction.

Jimenez Recio and Lopez–Meza also claim that, while the superceding indictment in this case alleges that they conspired to violate the narcotics law "from on or about a date uncertain, but by November 19, 1997," the district court's jury instruction indicated that the jurors could find Jimenez Recio and Lopez–Meza guilty of the larger conspiracy, "whether [they joined] before or after November 19, 1997." Jimenez Recio and Lopez–Meza argue that because the indictment limits proof to pre-seizure evidence, the alternative larger conspiracy theory was never brought before the grand jury, thus they contend that to instruct on the larger theory constituted an impermissible variance.

Although it appears that Jimenez Recio and Lopez–Meza objected to the jury instruction for the larger conspiracy, they failed to make a variance argument to the district court. We review only for plain error. *See United States v. Olano,* 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). We may exercise our discretion to correct such an error only when (1) the error is obvious; (2) the error affects substantial rights; and (3) a miscarriage of justice would otherwise result. *See United States v. Sayetsitty,* 107 F.3d 1405, 1411–12 (9th Cir.1997) (quoting *United States v. Olano,* 507 U.S. 725, 734–736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). An error is "clear" or "obvious" only if "a competent district judge should be able to avoid it without benefit of objection." *United States v. Turman,* 122 F.3d 1167, 1170 (9th Cir.1997).

The Fifth Amendment grants a defendant the right to be tried only on the grand jury's indictment. *See United States v. Olson,* 925 F.2d 1170, 1175 (9th Cir.1991). Sometimes divergence of trial proof from an indictment is harmless error; other times such divergence constitutes an amendment that broadens the

indictment, requiring per se reversal. *See id.* When time is not a material element of an offense, however, the court may constructively amend the indictment without violating the Fifth Amendment at all. *See United States v. Laykin,* 886 F.2d 1534, 1544 (9th Cir.1989) (requiring only that the defendants had adequate notice of the charges against them); *United States v. Echeverry,* 698 F.2d 375, 377 (9th Cir.1983) (dictum) (conspiracy conviction could be affirmed if the jury agreed upon a conspiracy of some duration even if not the time frame as charged in the indictment).

This variance issue might have presented a close question if Jimenez Recio and Lopez–Meza had properly objected. However, they did not do so. In review for plain error it is significant that even if the indictment time frame differed from the jury instruction time frame in the second trial, the end date of the conspiracy was not an element of the crime charged against Jimenez Recio and Lopez–Meza. *See Laykin,* 886 F.2d at 1545. Furthermore, because Jimenez Recio and Lopez–Meza were tried on the larger conspiracy theory in the first trial, they cannot claim that they lacked notice of the larger conspiracy theory in the second trial. Under such circumstances, any variance did not rise to the level of plain error.

Jimenez Recio and Lopez–Meza also make a cumbersome and complex argument that the wording of the jury instruction concerning the larger conspiracy impermissibly placed the burden on them affirmatively to prove the termination of the smaller conspiracy by demonstrating that no other loads of drugs existed. Again, because Jimenez Recio and Lopez–Meza did not raise this argument before the district court, we review only for plain error.

There was no plain error from burden shifting. Every paragraph of Instruction No. 24 places the burden on the govern-ment to prove the defendants' involvement in the conspiracy, whether the small or the large, "beyond a reasonable doubt." Any lack of clarity in the instructions does not rise to the level of plain error because a competent district judge cannot be expected to avoid this alleged complex burden shifting error without benefit of objection.

Fourth, Jimenez Recio and Lopez–Meza argue that the district court erred by allowing the jury to hear evidence over objection regarding the odor of burned marijuana in the car that Lopez–Meza was driving when he was arrested. Jimenez Recio and Lopez–Meza rely on *United States v. Vizcarra–Martinez,* 66 F.3d 1006, 1012, 1013 (9th Cir.1995), to argue that the odor evidence should not have been admitted as an exception to Federal Rule of Evidence 404(b), and in any event, should have been excluded pursuant to Federal Rule of Evidence 403. Their argument lacks merit.

A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion. *See United States v. Hernandez,* 109 F.3d 1450, 1452 (9th Cir.1997). An appellate court will only reverse for abuse of discretion if an evidentiary error more likely than not affected the verdict. *See United States v. Karterman,* 60 F.3d 576, 579 (9th Cir.1995). "Other act" evidence can be admitted as an exception to Rule 404(b) if (1) the evidence is "inextricably intertwined" with the charged crime, or (2) if the evidence is necessary "to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *Vizcarra–Martinez,* 66 F.3d at 1012, 1013 (excluding personal use methamphetamine in a case involving possession of a chemical precursor). Here, the district court did not abuse its discretion by concluding that the evidence could be admitted as "inextricably intertwined" and going to show knowl-

edge, intent and the absence of mistake. For the same reasons, the district court did not abuse its discretion in finding the odor evidence relevant under Rule 403.

Jimenez Recio and Lopez–Meza also argue that the district court erred by denying a motion for a mistrial due to prosecutorial misconduct and by failing to give a curative instruction regarding prosecutorial misconduct. I disagree. During trial, the prosecutor referred to a place that the government argued was the intended destination of the drugs as a "stash house." Jimenez Recio and Lopez–Meza objected to the use of this term. The district court sustained the objection, but allowed the government to refer to the residence as the destination of the drugs. At closing argument, the prosecutor again referred to the residence as a "stash house." The defendants objected, moved for a mistrial and requested a limiting instruction. The court sustained the objection, denied the motion for a new trial to allow more leeway because the prosecutor was engaged in argument, and did not give a limiting instruction.

The district court's denial of a motion for a mistrial is reviewed for abuse of discretion. *See United States v. Ramirez,* 176 F.3d 1179, 1183 (9th Cir.1999). A district court's refusal to give a limiting instruction also is reviewed for abuse of discretion. *See United States v. Soliman,* 813 F.2d 277, 278 (9th Cir.1987). To determine whether alleged prosecutorial misconduct requires reversal, this court must consider, in the context of the entire trial, whether the conduct appears likely to have affected the jury's ability to judge the evidence fairly. *See United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Reversal is only required if it is more probable than not that the alleged misconduct affected the jury's verdict. *See United States v. Simtob,* 901 F.2d 799, 806 (9th Cir.1990).

Here, the prosecutor's reference to the alleged drug destination as a "stash house" during closing argument may have gone a bit beyond spirited advocacy, as the district court acknowledged by sustaining the defendants' objections. The court, however, instructed the prosecutor to refrain from referring to the alleged destination as the "stash house," and the prosecutor so refrained. Considering the weight of the evidence against Jimenez Recio and Lopez–Meza, and the relatively benign nature of the prosecutor's statement in the context of the rest of the trial, the district court did not abuse its discretion by refusing to grant a motion for a mistrial or by refusing to give a limiting instruction to the jury.

Finally, Jimenez Recio and Lopez–Meza argue that the district court improperly admitted expert testimony under Federal Rules of Evidence 702 and 704 when Agent Hinton, after being qualified as an expert, opined over objection that (1) the conspiracy involved a large and complex organization, and (2) the conspiracy was involved in other prior loads of drugs.

This court reviews for abuse of discretion a district court's decision to admit expert testimony. *See United States v. Campos,* 217 F.3d 707, 710 (9th Cir.2000). Federal Rule of Evidence 702 provides that a qualified expert may testify if his "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Federal Rule of Evidence 704 allows a qualified expert to state an opinion regarding an ultimate issue, provided that the ultimate issue does not pertain to the mental state or condition of a defendant in a criminal case.

Here, the district court qualified Hinton as an expert based on his knowledge, experience, training and education. Hinton's testimony that the organization "was involved in other loads," while helping estab-

lish the existence of a larger conspiracy, was the agent's opinion, based on his expertise, of whether the facts and circumstances of this group of people and their activities demonstrated a conspiracy larger than just the one load of marijuana and cocaine. Because Hinton's testimony at all times remained within boundaries set by Rules 702 and 704, the district court did not abuse its discretion by admitting the testimony.

## IV. CONCLUSION

The majority correctly is concerned that proof be made of criminal conspiracy beyond a reasonable doubt, but the majority incorrectly invades the province of a jury when it holds that evidence in the second trial was insufficient. The legal test to determine if a second trial was permissible requires us to assess the boundaries of permissible inferences that a jury reasonably could have drawn when viewing all of the evidence in the light most favorable to the government. In this light, the evidence was sufficient to permit the jury to determine, beyond a reasonable doubt, that there was a serious criminal conspiracy in which Jimenez Recio and Lopez–Meza were involved before the drugs were seized. Moreover, the evidence was sufficient for a jury to conclude beyond a reasonable doubt that there existed a broader conspiracy—involving more than one load—in which Jimenez Recio and Lopez–Meza had actual or constructive knowledge and for which Jimenez Recio and Lopez–Meza took deliberate steps. Jimenez Recio and Lopez–Meza sought to advance the conspiracy's unlawful aims by their own unlawful acts.

The majority addresses only a part of the evidence, ignoring key proof considered herein. The majority takes no heed of the fact that a jury was properly instructed to find guilt only if proven beyond a reasonable doubt. In returning its verdict, the jury said that it had no reasonable doubt. The evidence in the second trial is sufficient to support the jury's decision.[5] I

---

**5.** I also conclude that the evidence at the first trial was sufficient to support a jury verdict of Jimenez Recio and Lopez–Meza's guilt beyond a reasonable doubt in conspiring before the seizure, contrary to the position of the concurring opinion. Because the first trial's evidence was sufficient to convict, I need not address the appellants' contention, credited in the concurrence over the government's opposing view, that double jeopardy barred a second trial.

The majority, in footnote 1, mistakenly urges that the "second trial included all the evidence at the first trial as well as additional testimony analyzing telephone records and the opinion of a government expert that the conspiracy was a large operation." The majority is correct in part in detailing some of the new evidence presented in the second trial. But it is not correct that all evidence at the first trial was presented in the second trial. For example, while evidence in the second trial shows "Raul" as a key conspirator, evidence in the first trial disclosed more, indeed that he was the owner of the drugs. While evidence in the second trial shows that

Raul's nephew Lopez–Meza had a very close relationship with Raul, living under the same roof and sharing use of a cell phone, evidence in the first trial included a jail house confrontation, which a jury might have considered threatening to co-conspirator Arce, in which Lopez–Meza said that "He [Lopez–Meza] was the one that helped his Uncle Raoul."

This showing in the first trial, along with the other evidence presented that was substantially similar to that in the second trial, unmistakably was sufficient for a jury to convict beyond a reasonable doubt. The concurrence argues contrary to the great weight of evidence that Jimenez Recio and Lopez–Meza were merely "mules" but the evidence reviewed above shows, to the contrary, both their probable involvement in conspiracy before the drug seizure and their probable participation in a broader conspiracy. As the concurrence sees it, Lopez–Meza might be viewed as a mere "mule" even though he is the nephew of the owner of the drugs seized, the "one who helps" his uncle Raul, and one who shares a cell phone and roof with Raul, and even though he was entrusted with an immense truckload of drugs with a value ex-

would affirm the district court's correct decision to let the jury verdict stand after the second trial.

ceeding ten million dollars. The position that Lopez–Meza, or for that matter Jimenez Recio, can be viewed as "mules," unthinking beasts of burden, does not accord with common sense. The evidence in the first trial was sufficient to convict both Jimenez Recio and Lopez–Meza beyond a reasonable doubt. In that trial, as well as in the second trial, the weighing of a mass of damaging evidence was in the jury's province; it is not properly within ours.